# FILED

NOV - 1 2023

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | | 23-CR-585 |
| UNITED STATES OF AMERICA | ) | JUDGE GETTLEMAN |
| | ) No. | MAGISTRATE JUDGE COLE |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| LAWRENCE JACKSON | ) | Code, Sections 1512(c)(2) and |
| | ) | 1623(a) |

## COUNT ONE

The SPECIAL OCTOBER 2022 GRAND JURY charges:

1.      At times material to this indictment:

### Relevant Entities and Individuals

a.      Individual A was the president and director of Company A-1, a waste hauling services company based in Markham, Illinois.

b.      Individual A and his wife were the operator and manager, respectively, of another one of Individual A's Businesses, Company A-2, a recycling and waste transfer business located in Riverdale that sold recycled construction and building materials.

c.      Individual A owned and or controlled several other businesses in the Northern District of Illinois (collectively, "Individual A's Businesses").

d.      Defendant LAWRENCE JACKSON was the president of the Village of Riverdale, a municipality in the Northern District of Illinois ("Riverdale").

e.      Beginning no later than in or around September 2017, JACKSON's wife, who was otherwise employed full-time, was also employed and paid by one of Individual A's Businesses.

f.     JACKSON   and   his   wife   owned   Centennial   Holdings ("Centennial"), a trucking company established in or around March 2018.

g.     Tri-State Disposal Inc. ("Tri-State") was a waste management company located in Riverdale, which had a contract with Riverdale to perform garbage collection services between in or around 2012 and in or around 2019. Under this contract, Tri-State was obligated to perform additional garbage collection services in May 2018 for no extra charge (the "2018 spring clean-up").

h.     Company B was a waste management company that provided garbage collection services.

i.     Individual B was the Village Administrator for Riverdale.

**Individual A operates Centennial for JACKSON's Benefit**

2.     Although JACKSON and his wife owned Centennial on paper, Individual A effectively operated Centennial for the benefit of JACKSON and his wife, who had no experience in or knowledge of the trucking business. Individual A's Businesses financed Centennial's operations with a loan and advanced money for Centennial's operating expenses, such as the costs of fuel, insurance, repairs, and licensing, which was repaid from Centennial's income. Centennial's income came from providing hauling services to Individual A's Businesses, which deducted from their payments to Centennial the expenses that Individual A's Businesses incurred in operating Centennial and payments on the loan, until Individual A forgave the balance of the loan.

2

3.     The trucks that Centennial operated were originally owned by Individual A, Individual A's wife, or one of Individual A's Businesses and transferred or leased to Centennial. Individual A's Businesses housed and maintained the trucks for Centennial.

4.     Drivers operating Centennial's trucks were recommended and interviewed by Individual A and hired by JACKSON with the assistance of Individual A. Individual A's Businesses assigned Centennial's trucks to jobsites on a daily or periodic basis to haul materials and debris for Individual A's Businesses.

5.     Individual A's Businesses did not pay Centennial directly. Instead, Company A-1 paid third-party entities, which after deducting a fee, passed on the remainder to Centennial in the form of checks drawn on the accounts of the third-party entities. The third-party entities' primary role in the operation of Centennial was to conceal payments from Individual A's Businesses to Centennial.

6.     JACKSON often obtained directly from Company A-1 the third-party entity checks payable to Centennial, which were, in fact, payments from Individual A's Businesses. JACKSON paid Centennial's drivers at the direction of Individual A.

7.     JACKSON regularly communicated with Individual A and employees of Individual A's Businesses about Centennial's operations, including employee hiring, truck maintenance and repair, Centennial business records, and payments to Centennial for work performed for Individual A's Businesses. JACKSON was dependent upon Individual A to obtain documents and records relating to the

operation of Centennial. Neither JACKSON's wife nor JACKSON's accountant had any role in the operation of Centennial.

**Tri-State opposes Riverdale Issuing
a Special Use Zoning Permit to Individual A's Company**

8.     In or around September 2017, Individual A's company, Company A-2, applied for a special use zoning permit to operate a recycling facility and waste transfer station in Riverdale. Subsequently, at various public hearings, Tri-State opposed Riverdale issuing the special use zoning permit to Company A-2.

**Individual A assists JACKSON in replacing Tri-State with Company B**

9.     On or about March 20, 2018, JACKSON received an email from Tri-State inquiring why Riverdale had not responded to Tri-State's request to discuss scheduling the 2018 spring clean-up. That same day, JACKSON forwarded Tri-Sate's email to Individual A, and asked Individual A, "Can you please assist me with this?" After Individual A agreed to assist JACKSON, JACKSON responded, "Thx. I will let Tri State know we are not using them."

10.     In or around March 2018 and April 2018, JACKSON caused Riverdale to contract with Company B to perform the 2018 spring clean-up, which cost Riverdale approximately $18,000 in additional charges.     JACKSON caused Riversdale to enter into this agreement despite Tri-State being under a contractual obligation to perform the 2018 spring clean-up for Riverdale at no extra charge.

11.     In or around May 2018, Individual A arranged for a meeting between Individual A, JACKSON and a representative of Company B. In subsequent meetings in or around 2018, JACKSON and the Company B representative discussed Riverdale

4

contracting with Company B to perform garbage collection services, instead of renewing the contract with Tri-State. Individual A attended these meetings with Jackson and the Company B representative, and served as an intermediary in the exchange of information and documents between JACKSON and Company B.

12.     In or around November 2018, JACKSON caused Riverdale to enter into a contract with Company B to perform garbage collection services in Riverdale upon the expiration of Tri-State's contract in 2019.

### The Tri-State Lawsuit

13.     On or about February 23, 2018, Tri-State filed a civil complaint against Riverdale and JACKSON in Cook County Chancery Court, Illinois, which lawsuit was removed to the United States District Court for the Northern District of Illinois on or about March 23, 2018, and captioned as *Tri-State Disposal Inc. v. the Village of Riverdale et al.*, No. 18 CV 2138 (the *"Tri-State* lawsuit"). Tri-State amended its civil complaint on or about June 8, 2018, after Riverdale made known its decision not to renew Tri-State's contract.

14.     The civil complaint, as amended, alleged that in November 2017, JACKSON caused Riverdale to give preferential treatment to Company A-2, by unlawfully causing Riverdale to issue a conditional use zoning permit to Company A-2 that allowed Company A-2 to operate on an industrial lot in Riverdale, which operations posed an environmental hazard to the public. Tri-State further alleged that, after the owners of Tri-State spoke out at various public hearings against the issuance of a special use zoning permit to Company A-2, JACKSON retaliated against

Tri-State by refusing to renew its garbage collection contract with Tri-State, and by other means. Tri-State sought an award of damages in excess of $260,000.

15. On or about February 25, 2021, JACKSON participated in a deposition, that is, he was placed under oath and answered questions posed by an attorney for Tri-State.

16. The following matters, among others, were material to the deposition and lawsuit:

- Whether JACKSON had any reason to be favorably biased toward Individual A and businesses owned by Individual A and/or members of Individual A's family, or to be prejudiced against Tri-State;

- Whether Centennial had any business dealings with companies owned by Individual A and/or members of Individual A's family;

- Whether JACKSON had knowledge of Centennial's business dealings with companies owned by Individual A and /or members of Individual A's family; and

- Whether JACKSON was involved with Riverdale's hiring of Company B to do the 2018 spring clean-up.

17. JACKSON communicated with Individual A immediately before his deposition. During his deposition, JACKSON exchanged text messages with Individual A regarding the topics covered during his deposition.

18. JACKSON's answers to questions during the deposition were designed and intended to conceal both Individual A's extensive involvement in the operations of Centennial, Individual A's relationship with JACKSON, and JACKSON's and Individual A's involvement in Riverdale's replacement of Tri-State with Company B to perform the 2018 spring clean-up.

6

19.     On or about February 25, 2021, at Chicago and Palos Heights, in the Northern District of Illinois, Eastern Division,

LAWRENCE JACKSON,

defendant herein, was placed under oath prior to testifying at a deposition taken in the *Tri-State* lawsuit, a proceeding before and ancillary to a court of the United States, was advised that his testimony was subject to the penalties of perjury, and knowingly made a false material declaration during his testimony by responding to questions as follows:

[1]    Q:    Okay, so just to set the record straight, Centennial Holdings, owned by you and your wife, may or may not have done or is doing business with [Company A-2] or any company owned by the [Individual A's last name] family?

       A:    I don't believe so.

       Q:    Ok, but you said possible. Possibly.

       A:    There - There is a possibility, sir, but I'm not certain because I don't handle the day-to-day operations of the business.

       Q:    Okay. Who does?

       A:    *That would be my wife*, and also wherever we are dispatched to work at.

WHEREAS, in truth and fact, JACKSON knew that his wife did not "handle the day-to-day operations" of Centennial or have any other involvement in running the business, but rather that Individual A and employees of Individual A's Businesses handled the day-to-day operations of Centennial.

[2]    Q:    All right. Do you lease the trucks for a full month?

       A:    Yes.

7

Q:    How much?

A:    *My accountant handles that.*

WHEREAS, in truth and fact, JACKSON knew that his accountant did not "handle" or have any involvement in the leasing of Centennial's trucks.

[3]    Q:    Okay. Does your business keep internal books and records?

A:    *My wife, she handles that as well.*

Court reporter: I'm sorry, I didn't hear that.

A:    *My wife handles that as well.*

WHEREAS, in truth and fact, JACKSON knew that his wife did not keep or "handle" Centennial's "internal books and records," but rather that Individual A and employees of Individual A's Businesses had control of the documents and records generated in the operation of Centennial.

[4]    Q:    How did you come to know [Company B]?

A:    *They had introduction with me through my then Village Administrator, [Individual B].*

WHEREAS, in truth and fact, JACKSON knew that Individual B did not introduce him to Company B, but rather that Individual A introduced JACKSON to a representative of Company B for the purposes of discussing Company B replacing Tri-State.

[5]    Q:    Okay. [Company B] gets hired to do the spring clean-up. Do you have anything to do with that?

A:    *No. I did not.*

WHEREAS, in truth and fact, JACKSON knew that he, JACKSON, was involved in the process of hiring Company B to do the 2018 spring clean-up;

[6]    Q:    [Court reporter reading back plaintiff attorney's question]: . . . On the record, the question is, why did the Village of Riverdale pay [Company C] $18,000 to do the 2018 spring clean-up that Tri-State Disposal was obligated to do under the contract – ready, willing, and able to do under their contract – free of charge?

* * * *

    A:    So with – with regards to the annual clean-up, I have never supervised or managed the coordination of that program or project. That was given to [Individual B]. *[Individual B] opted to go with a different vendor. The Board of Trustees upheld his decision* and paid the bill.

    Q:    And you didn't have anything to do with it?

    A:    *Not at all, sir.*

WHEREAS, in truth and fact, JACKSON knew that Individual B did not "opt to go with a different vendor" nor did Individual B make the "decision" to hire Company B to do the 2018 spring clean-up;

In violation of Title 18, United States Code, 1623(a).

## COUNT TWO

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      Paragraphs 1 through 15 of Count One are incorporated here.

2.      On or about February 25, 2021, JACKSON testified falsely under oath at a deposition taken in the *Tri-State* lawsuit, in an attempt to obstruct, influence, and impede an official proceeding. In substance, among other things, defendant JACKSON falsely testified about the following topics:

      a.      Whether his wife handled the day-to-day operations of Centennial or had any other involvement in running the business;

      b.      Whether his accountant handled or had any involvement in the leasing of Centennial's trucks;

      c.      Whether his wife kept or handled Centennial's internal books and records;

      d.      Whether Individual B introduced JACKSON to Company B;

      e.      Whether Individual B recommended Company B;

      f.      Whether Individual B made the decision to hire Company B to do the spring clean-up; and

      g.      Whether JACKSON was involved in the decision to hire Company B to do the spring clean-up.

3.     On or about February 25, 2021, at Chicago and Palos Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

LAWRENCE JACKSON,

defendant herein, did corruptly obstruct, influence and impede an official proceeding, and attempt to do so, namely, the *Tri-State* lawsuit, in that the testimony described in paragraph 2 of this Count was false;

In violation of Title 18, United States Code, Section 1512(c)(2).

A TRUE BILL:

_____
FOREPERSON

_____
ACTING UNITED STATES ATTORNEY